GLEN NATIONAL BANK, Respondent, *v.* THE AUTOMOBILE INSURANCE COMPANY OF HARTFORD, CONNECTICUT, Appellant. (Action No. 1.)

GLEN NATIONAL BANK, Respondent, *v.* COMMERCIAL UNION ASSURANCE COMPANY, LIMITED, Appellant. (Action No. 2.)

GLEN NATIONAL BANK, Respondent, *v.* CONTINENTAL INSURANCE COMPANY, Appellant. (Action No. 3.)

GLEN NATIONAL BANK, Respondent, *v.* HARTFORD FIRE INSURANCE COMPANY, Appellant. (Action No. 4.)

GLEN NATIONAL BANK, Respondent, *v.* THE HOME INSURANCE COMPANY, Respondent. (Action No. 5.)

GLEN NATIONAL BANK, Respondent, *v.* LONDON ASSURANCE CORPORATION, Appellant. (Action No. 6.)

GLEN NATIONAL BANK, Respondent, *v.* NATIONAL BEN-FRANKLIN FIRE INSURANCE COMPANY OF PITTSBURG, PA., Appellant. (Action No. 7.)

GLEN NATIONAL BANK, Respondent, *v.* NATIONAL LIBERTY FIRE INSURANCE COMPANY OF AMERICA, Appellant. (Action No. 8.)

GLEN NATIONAL BANK, Respondent, *v.* NIAGARA FIRE INSURANCE COMPANY, Appellant. (Action No. 9.)

GLEN NATIONAL BANK, Respondent, *v.* NORTHWESTERN NATIONAL INSURANCE COMPANY, Appellant. (Action No. 10.)

GLEN NATIONAL BANK, Respondent, *v.* THE PHOENIX INSURANCE COMPANY, Appellant. (Action No. 11.)

GLEN NATIONAL BANK, Respondent, *v.* PROVIDENCE WASHINGTON INSURANCE COMPANY, Appellant. (Action No. 12.)

GLEN NATIONAL BANK, Respondent, *v.* SPRINGFIELD FIRE AND MARINE INSURANCE COMPANY, Appellant. (Action No. 13.)

GLEN NATIONAL BANK, Respondent, *v.* TOKIO MARINE & FIRE INSURANCE COMPANY, LIMITED, Appellant. (Action No. 14.)

GLEN NATIONAL BANK, Respondent, *v.* WESTCHESTER FIRE INSURANCE COMPANY OF NEW YORK, Appellant. (Action No. 15.)

Third Department, January 14, 1937.

*Hinman, Howard & Kattell* [*C. Addison Keeler* of counsel], for the appellants.

*Lee, Levene & McAvoy* [*David F. Lee* of counsel], for the respondent.

PER CURIAM. Appeal from judgments for fire damage in favor of the plaintiff as demanded in the several complaints. These judgments were entered after the verdict of a jury.

It is unquestioned that plaintiff's banking house was damaged on October 12, 1926, at least to the amount of the judgments. Most of the damage was caused by an explosion. It is the contention of the plaintiff that the explosion had been preceded by a hostile or negligent fire, while the defendants contend that there was no hostile fire until after the explosion, which they argue was caused by a friendly fire — a match in the hands of the janitor, Furner, which he had ignited to furnish light to aid him in investigating the cause of a hissing noise that he heard in the southeast corner of the basement of the building. The parties differ little if any upon the law. The New York State case chiefly featured in the brief by the appellants is *Briggs* v. *N. A. & M. Ins. Co.* (53 N. Y. 446) while the respondent first cites *Wheeler* v. *Phenix Insurance Co.* (203 N. Y. 283). Judge HAIGHT, who wrote the opinion in the latter case, stated: " We do not regard the case of *Briggs* v. *North American*

*and Mercantile Insurance Co.* (53 N. Y. 446) or the case of *Hustace v. Phenix Ins. Co. of Brooklyn* (175 N. Y. 292) as in conflict with the views hereinabove expressed " (p. 289). The doctrine enunciated in that opinion is indicated by the following: " It has frequently been considered by the courts and text writers upon the subject, who have quite uniformly reached the conclusion that when a negligent or hostile fire exists within the insured premises and an explosion results therefrom under such circumstances as to constitute the fire the proximate cause of the loss and the explosion merely incidental, the company becomes liable upon its policy for the loss resulting therefrom " (p. 288). In discussing the opinion by Justice SWAYNE in *Washburn* v. *Miami Valley Ins. Co.* (2 Fed. 633) Judge HAIGHT in the *Wheeler* case says with approval: " He then proceeds with an elaborate discussion of the question, reaching the conclusion that the explosion was a part of the fire and as such was covered by the general language of the insurance policy " (pp. 288, 289).

The extent of damage to the building is not questioned, the evidence by Furner that he lighted a match to aid in his inspection was not controverted, the trial justice outlined the question of fact lucidly and succinctly, " If this fire of the match in the hands of Mr. Furner set off the explosion, an immediate, instantaneous explosion, as is claimed by the defendants, there is no recovery here. Your verdict will be no cause of action. * * * If this fire from the match caused a fire of gas that became ignited from it, which burned an appreciable length of time, which in burning caused the joists to become aflame, and then and then only the explosion occurred, then if you find that is the fact, you may say that the fire in the rafter was a hostile fire, even though it may originally have been caused by the match. In other words * * *, if you find that there was an explosion and that that explosion followed and was incident to a hostile fire such as I have illustrated, if you should find a fire in the rafter and the explosion followed it, was incident to it, then your verdict may be for the plaintiff here."

Defendants' reliance is placed quite largely upon the deposition of Furner who was dead at the time of the trial. The building was damaged on Columbus day when the bank was closed. Furner had worked about the building during the day and just before six o'clock had brought in the flags which had been displayed outside and placed them in the southeast corner of the basement. He stated, " Why, I just got the flags back and I thought I heard a hissing noise and I thought it sounded like steam escaping, and I went over to where the noise seemed to be and struck a match. * * * Q. And what happened? A. Enough happened. Q.

Describe it in your own way. A. There wasn't anything to describe. Q. Give your best description of it. A. The noise I heard resembled putting dynamite under a stump in a field. Q. How many of those noises did you hear? A. Just one. Q. What happened to you? A. I must have got knocked over on the cement. Q. Then what? A. I was all buried up and I uncovered myself. Q. What were you buried up with? A. Lumber and one thing and another. Q. Were you unconscious? A. No, sir. Q. When you uncovered yourself, as you say, what did you do? A. Got up and walked out. Q. Where did you walk? A. Right out through the basement. Q. To the westerly end of the building and through the same doorway? A. Yes, sir. Q. You went back how far? A. Clear to the west end. * * * Q. How did you get out? A. I climbed up through the doorway, stuck my head up. * * * Q. Did you see any indication of fire? A. No, sir. Q. Did you smell any smoke? A. No, sir. * * * Q. Who was it that assisted you out of the basement when you were crawling out, or assisted you? A. Dan Murphy took hold of my arm. Q. You had got nearly out then? A. Yes, sir." Plaintiff argues that this evidence, which would sustain a finding that an explosion followed immediately upon the lighting of the match and without an intervening hostile fire, is weakened by the following: That the weight of evidence shows that Furner was not assisted out of the northwest corner of the cellar by Murphy but by witnesses Bissell and Storch, aided by a Mr. Royce, Storch's evidence being, " Q. State where you observed the janitor, if you observed him. * * * A. He was six or eight feet from where the door had been down below where the floor had been covered with plaster, and boards and lath and part of the stairs, just his head sticking out. Q. What did you do? * * * A. I went right in and Mr. Bissell came in. Mr. Bissell spoke to Mr. Furner, I think his name was. I grabbed hold of his shoulders and pulled him out. Somebody else came along and gave me a hand in getting him out. They got him out and put him in a car and took him to the hospital. Q. At the time you saw him there at the back end, how much covered up was he with debris or wreckage? A. All except his head." Bissell's evidence was substantially the same. The plaintiff argues that the northwest corner of the basement being about eighty-six feet from the southeast corner where Furner stated he fell, it would have been impossible for him to walk through the basement to the northwest corner and cover himself with the debris mentioned. Also, that a 230-pound steel door from a storage vault in the basement was blown off and came to rest at the point where Furner claims to have fallen, the evidence as to the vault door being, " Q. The door to the easterly vault, did you

observe that? A. Yes, sir. Q. Was that on or off? A. Off. Q. Where was it located? A. It was blown back into the southeast corner. The joists of the floor stood down in front of the door. The door blew there and then the joists and flooring came down." Defendants place this door near but not at the point where Furner says he fell.

Among the items of proof which plaintiff argues sustain the inference drawn by the jury that the explosion was preceded by a hostile fire, are the following: That certain of the books and papers in the storage vault were burned and charred and the door thereof blown out as has been mentioned, and this because of pressure from within the vault, and in order to have had pressure within the vault a hostile gas fire would necessarily have traveled from the match, a distance of some twenty-five feet, and through the crevices about the door in order to have exploded the gas within the vault, and further, that charred pieces of wood were found forced into the ceiling of the room above the basement and outside of the building, and as the splinters of wood were driven into the ceiling and expelled from the building by the explosion it must have succeeded a hostile fire which had charred and burned the debris. A witness within a few feet of the bank building was asked, " Q. Just go back, Mr. Kelly. Prior to the time you saw any flames, did you at any time hear an explosion? A. No, sir. * * * Q. Did you see flames? A. I saw a flash from flames, or flames, something lit that window up so I could see it. Q. That window, was that about how far back in the bank, I mean as to distance, whether half way back or so? A. Back better than half or three-quarters of the way, I should say. [This would place the window where the flame was visible forty to sixty feet from the place where Furner says he lighted the match.] Q. Whatever happened to you, did it happen to you the way you have mentioned here? A. I guess it did. All I saw was that flash. I didn't see or hear anything after that. I was blown across the road. Q. Did you hear any noise at any time prior to the time you saw these flames there? A. No, sir, I didn't hear any at all."

From the foregoing, and but small and fragmentary portions of the evidence on either side have been referred to, there was a question of fact for the jury. The plaintiff having the verdict, upon this appeal is entitled to have the evidence in its favor viewed in the most favorable light.

The judgment and orders should be affirmed.

HILL, P. J., RHODES, CRAPSER, BLISS and HEFFERNAN, JJ., concur.

Judgment and orders affirmed, with one bill of costs.